## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:
ANTHONY JOHN PAGLIARO
              DEBTOR

CASE NO.  17-01176-5-SWH
CHAPTER 7

## MOTION FOR RELIEF FROM AUTOMATIC STAY (REAL PROPERTY)

## OR IN THE ALTERNATIVE ADEQUATE PROTECTION
### {No Protest Motion}

Bank of America, N.A. ("Movant"), a secured creditor in the above-captioned case, hereby moves this Court, pursuant to 11 U.S.C. § 362, for relief from the automatic stay or in the alternative for adequate protection with respect to certain real property of the Debtor(s) having an address of 102 Lands End Court, Hampstead, North Carolina 28443 (the "Property"), for all purposes allowed by the Note (defined below), the Deed of Trust (defined below), and applicable law, including but not limited to the right to foreclose. In further support of this Motion, Movant respectfully states:

1.   A petition under Chapter 7 of the United States Bankruptcy Code was filed with respect to the Debtor(s) on March 9, 2017.

2.   This Court has jurisdiction to hear this matter and enter a final order pursuant to 28 U.S.C. §§ 157 and 1334; and 11 U.S.C. § 362.

3.   The Debtor(s) has/have executed and delivered or is/are otherwise obligated with respect to that certain promissory note in the original principal amount of $229,500.00

(the "Note"). A copy of the Note is attached hereto as Exhibit A. Movant is an entity entitled to enforce the Note.

4.   Pursuant to that certain Deed of Trust (the "Deed of Trust"), all obligations (collectively, the "Obligations") of the Debtor(s) under and with respect to the Note and the Deed of Trust are secured by the Property. A copy of the Deed of Trust is attached hereto as Exhibit B. The Deed of Trust has been assigned to the Movant pursuant to that certain assignment of Deed of Trust, a copy of which is attached hereto as Exhibit C.

5.   As of April 6, 2017, the approximate outstanding amount of the Obligations less any partial payments or suspense balance is $246,194.10.

6.   The following chart sets forth the number and amount of payments due pursuant to the terms of the Note that have been missed by the Debtor(s) as of April 6, 2017:

| Number of Missed Payments | From | To | Monthly Payment Amount | Total Amounts Delinquent |
|---|---|---|---|---|
| 12 | April 1, 2016 | March 1, 2017 | $1,686.57 | $20,238.84 |
| 1 | April 1, 2017 | April 1, 2017 | $1,702.15 | $1,702.15 |
| | | | | Less partial payments: $0.00 |

**Total:  $21,940.99**

7.   The estimated market value of the Property is $293,012.00. The basis for such valuation is Schedule A.

8.   Upon information and belief, the encumbrances on the Property listed in the Schedules or otherwise known, including but not limited to the encumbrances granted to Movant, listed in order of priority are: (i) Movant ($246,194.10); (ii) Bank of America ($35,000.00); and (iii) NC Foreclosure Prevention Fund ($33,901.89).

9.   Cause exists for relief from the automatic stay for the following reasons:

   a.   Movant's interest in the Property is not adequately protected.

b.   Pursuant to 11 U.S.C. § 362(d)(2)(A), Debtor(s) has/have insignificant equity in the Property.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.   Relief from the stay for all purposes allowed by the Note, the Deed of Trust, and applicable law, including but not limited to allowing Movant (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property and any and all other collateral pledged under the Deed of Trust.

2.   That the Order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Code.

3.   That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

4.   That Movant be entitled to recover its reasonable fees and expenses incurred in connection with seeking the relief requested in this Motion.

5.   For such other relief as the Court deems proper.

In the alternative, Movant requests that this Court enter an order providing Movant with adequate protection of its interests in the Property.

This 21st day of April, 2017.

/s/ Neil D Jonas
Neil D Jonas (N.C. Bar No. 31622)
Attorneys for Movant
5121 Parkway Plaza Blvd., Suite 300
Charlotte, NC 28217
704-369-0676
ncbkr@brockandscott.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

IN RE:
ANTHONY JOHN PAGLIARO
                DEBTOR

CASE NO.  17-01176-5-SWH
CHAPTER 7

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies under penalty of perjury that he/she is over eighteen (18) years of age and that the MOTION FOR RELIEF FROM AUTOMATIC STAY in the above captioned case were this day served upon the below named persons by mailing, postage prepaid, first class mail a copy of such instrument to each person(s), parties, and/or counsel at the addresses shown below:

Anthony John Pagliaro
102 Lands End Court
Hampstead, NC 28443

Richard Preston Cook
7036 Wrightsville Ave., Suite 101
Wilmington, NC 28403

Algernon L. Butler, III
P. O. Box 38
Wilmington, NC 28402

This 21st day of April, 2017.

                            //s/ Julia Vericain
                            Julia Vericain
                            Brock & Scott, PLLC
                            5121 Parkway Plaza Blvd., Suite 300
                            Charlotte, NC 28217
                            Ph: (704) 369-0676
                            Fax: (704) 369-0760
                            bankruptcy@brockandscott.com

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

IN RE:
ANTHONY JOHN PAGLIARO
        DEBTOR

CASE NO.  17-01176-5-SWH
CHAPTER 7

## NOTICE OF MOTION

TO THE DEBTOR, DEBTOR'S ATTORNEY, TRUSTEE, AND ALL PARTIES IN INTEREST

  THIS NOTICE IS HEREBY GIVEN of a Motion for Relief from Automatic Stay filed simultaneously herewith in the above-captioned case, a copy of which is attached hereto, and;

  NOTICE IS FURTHER GIVEN that this motion may be allowed pursuant to 11 U.S.C. §362 provided no response and request for a hearing is made by the parties in interest in writing to the Clerk of Court within FOURTEEN (14) DAYS from the date of this notice, and;

  NOTICE IS FURTHER GIVEN that if a response and request for a hearing is filed by a party in interest named herein, in writing within the time indicated, a hearing will be conducted on the motion and response at a date and time to be later set by the Court and all parties will be notified accordingly.  If no response for a hearing is timely filed, the Court may rule on the Motion ex-parte without further notice.  Any party requesting a hearing shall appear at the hearing in support of such an objection or may be assessed with costs of Court.

This 21st day of April, 2017.

          /s/ Neil D Jonas
          Neil D Jonas (N.C. Bar No. 31622)
          Attorneys for Movant
          5121 Parkway Plaza Blvd., Suite 300
          Charlotte, NC 28217
          704-369-0676
          ncbkr@brockandscott.com

ORIGINAL

Loan No.: ███████

## NOTE

March 2, 2006

**102 Lands End Court**
**Hampstead, NC 28443**
[Property Address]

Surf City, North Carolina

**1.    BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $229,500.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Bank of America, N.A.. I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.    INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875%.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.    PAYMENTS**
**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the first day of each month beginning on November 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".
I will make my monthly payments at

Bank of America, N.A.
P.O. Box 17404
Baltimore, MD 21297-1404
or at a different place if required by the Note Holder.

**(B)    Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. $1,357.58.

**4.    BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.    LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.    BORROWER'S FAILURE TO PAY AS REQUIRED**

MULTISTATE FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
(R&A) 6302477 - nt5r.bax - Rev. 12/18/2004

Form 3200 1/01(Page 1 of 3 Pages)



Loan No.: ▮▮▮▮▮

**(A)     Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 4.000% of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B)     Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)     Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)     No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)     Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**7.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.     WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

MULTISTATE FIXED RATE NOTE--Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200  1/01(Page 2 of 3 Pages)
(R&A)  6302477 - nt5r.bax - Rev. 12/18/2004

Loan No.: ████

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
Anthony Pagliaro                    Borrower

Social Security Number

_____ (Seal)
Susan Pagliaro                      Borrower

Social Security Number

_____ (Seal)
                                    Borrower
Social Security Number

_____ (Seal)
                                    Borrower
Social Security Number

[Sign Original Only]

PAY TO THE ORDER OF

_____

WITHOUT RECOURSE _____
Bank of America, N.A.

BY _____
CHRISTINA M. SCHMITT
ASSISTANT VICE PRESIDENT

MULTISTATE FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3200  1/01(Page 3 of 3 Pages)
(R&A)  6302477 - nt5r.bxx - Rev. 12/18/2004

Loan No.: ██████████

## CONSTRUCTION  LOAN  ADDENDUM  TO  NOTE

THIS CONSTRUCTION  LOAN ADDENDUM  ("Addendum") is made this second  day of March, 2006 and is incorporated  into and shall be deemed  to amend and supplement  the Note (the "Note") of the same date given by the undersigned  (the "Borrower") to Bank of America, N.A. (the "Lender") in the amount  of $229,500.00 Dollars.

Terms defined in the Note shall have the same meaning in this Addendum.

In addition  to the covenants  and agreements  made in the Note, Borrower  and Lender agree as follows:

As a benefit to the Borrower, this Note is for a combined construction  and permanent  loan. This Note shall be entitled to the benefits of the terms and conditions  of the Residential  Construction  Loan Agreement  of even date herewith (the "Loan Agreement"),  which Agreement  provides  for periodic advances  of the principal  amount  of the Note for the purpose of constructing  or renovating  a residence  on the real property securing the Note.  Borrower acknowledges  that during this construction  phase, Borrower will have an Adjustable  Interest Rate as defined below. Borrower also acknowledges  there is a prepayment  penalty associated  with the loan during this phase.

A.    **INTEREST RATE DURING CONSTRUCTION  LOAN PHASE.** The term "Construction  Loan Phase" as used herein shall mean  the time period beginning  with the initial advance  of loan proceeds  whether at loan closing or later and ending on _____October 1, 2006_____ (the "Rollover Date".) Notwithstanding  the provisions  of the Note Borrower shall make monthly payments of interest only, as billed by Lender.  The interest on the sums disbursed and outstanding  from time to time, during the Construction  Loan Phase shall accrue at the rate stated below:

At a varying rate per annum  (the "Rate") equal to _____One (1%)_____ percent plus the Prime Commercial Lending  Rate (the "Index") as such rate exists daily (the "Applicable Rate").  Interest shall be calculated  daily on the outstanding  principal  balance and the interest rate shall change as and when said Prime Commercial Lending  Rate changes.  The interest rate shall not exceed an annualized rate of eighteen percent (18%) or applicable  usury ceiling, whichever is lower.

The Index shall mean the base interest rate on corporate  loans posted by at least 75% of the thirty largest U.S. Banks as reported  daily in The Wall Street Journal, New York edition and is not the best index or rate Lender uses to make loans.

Notwithstanding  the foregoing, if such base interest rate ceases to be announced  or published  by The Wall Street Journal, then, in such event, Lender shall select an alternate  but similar index and advise Borrower in writing of such selection.

During the Construction  Loan Phase interest shall accrue and be calculated  on a 365 day annual basis by computing a daily amount  of interest  for a 365 day year and multiplying  that amount  by the number  of days in each interest calculation  period.

All interest accrued during the Construction  Loan Phase shall be due and payable in full on the Rollover Date.

B.    [ X ] **CONSTRUCTION  LOAN PHASE PREPAYMENT.** You have the right to make nonscheduled  payments of principal at any time before they are due. This payment of principal is known as a "prepayment." A prepayment  of the entire  unpaid principal is known as a "full payment."  Any amount prepaid that is less than the entire  unpaid principal is known as a "partial prepayment." Any amount  of the loan proceeds  not disbursed as agreed is known as "underdisbursement."  During the Construction  Loan Phase and prior to the Rollover Date, you may prepay up to 40% of the original principal amount  of the loan without a prepayment  charge.  If you prepay an amount  in excess of 40%, you will be required to pay a fee equal to 2% of the original principal amount  of the loan.  In addition,  if the total loan proceeds  disbursed during the Construction  Loan Phase is less than 60% of the original face amount  of the Note, you will be required to pay a prepayment  fee equal to 2% of the original face amount  of the Loan.  The 2% fee shall also be payable if by the combination  of a partial prepayment  and underdisbursement  of loan proceeds, the principal balance at Rollover Date is less than 60% of the original face amount  of the Note.

(R&A)  6302477 – cnstlnrd.hox – Rev. 07/27/2004

Loan No.: ███████

**C.**  **WAIVERS BY BORROWER.**  To the extent allowed by law and notwithstanding any other provision in the Note, the Security Instrument of even date and the Residential Construction Loan Agreement (the "Loan Documents") to the contrary, Borrower and any other person who has obligations under the Note, jointly and severally waive notice of default and presentment, notice of dishonor, and notice of intention to accelerate the maturity of the Note, and notice of acceleration of the Note; further, Borrower and all Guarantors, if any, agree to all extensions of time for payment under the Note, renewals of the Note including changing the terms thereof, acceptance by the Lender of partial payments on the Note, and releases of liability as to certain parties obligated under the Loan Documents, and partial or full releases of property securing said Note.

**D.**  **LENDER'S REMEDIES UPON DEFAULT.**

1.  **Acceleration of Maturity of Note.**  Upon any monetary or non-monetary default by Borrower of any provision of the Loan Documents, Lender may declare the unpaid principal of the Note and all accrued interest thereon immediately due and payable. Lender's right to accelerate the maturity of the Note as to any subsequent default shall not be impaired or waived by any election by Lender not to exercise it upon a default by Borrower.

2.  **Right of Offset.**  Upon any monetary default by Borrower, Lender shall have in addition to all other remedies the remedy of offset to the extent of monies owed to Borrower or Guarantors, if any, herein as against Lender's obligations to such Borrower or Guarantors.

**E.**  **PERMANENT PHASE INTEREST RATE.**  Borrower's permanent phase interest rate effective on Rollover Date will be as stated or determined below:

1.  **[N/A]**  Notwithstanding the rate of interest stated in Section 2 of the Note, (the "Face Rate"), if on the date 45 days prior to the Construction Completion Date the prevailing market rate of interest offered by Lender for 60-day lock-ins for the loan type with terms comparable to those contained in the Note (the "Market Rate") taking any and all previously paid fees and/or discount points into account, is less than the Face Rate, then the Note will be modified to the lower Market Rate. Any such change in the interest rate shall be evidenced by written modification agreement between Borrower and Lender and such agreement (if applicable) shall also reflect changes to other Note terms as required; or

2.  **[X]**  The Note rate shall be the Face Rate as stated and/or calculated therein.

**F.**  **OPTION TO MODIFY ADJUSTABLE RATE NOTE TO FIXED RATE TERMS DURING CONSTRUCTION LOAN PHASE.**

**[N/A]**  If checked, Borrower shall have the right to modify the Permanent Phase of the loan from one with an adjustable rate of interest as set forth in the Note to one with a fixed rate of interest equal to the interest rate Lender is offering for 60 day lock-ins for mortgage loans with comparable terms, 45 days prior to the Construction Completion Date taking into account any and all previously paid fees and/or discount points, provided such rate is equal to or less than the Face Rate, and provided the following conditions are adhered to:

1.  Borrower must not be in default under the Note, the Security Instrument or the Residential Construction Loan Agreement.
2.  Borrower pays a non-refundable $250.00 rollover modification option fee at closing.
3.  The loan term for the Permanent Loan Phase must remain the same.
4.  The improvements to the subject property must be completed by the original Construction Completion Date September 2, 2006.
5.  In the event there is no comparable rate for the loan discount paid at closing, when it is time to determine the fixed rate of interest for the Permanent Loan Phase of your Loan you will receive the next highest rate with a curtailment to the principal balance for the unused discount points paid, if any. You may not buy down the rate any further.

The Modification Agreement prepared for execution by Borrower and Lender will specify the new monthly payment amount of principal and interest necessary to amortize the loan to date of maturity. The new monthly payment will be first due on the first day of the second month after the date of modification.

Loan No.: ▮▮▮▮▮▮▮

G.   **LATE OR EARLY COMPLETION OF CONSTRUCTION.** The Construction Completion Date is September 2, 2006.

1.   **Late Completion.** Failure to complete construction of the Residence as described in the Residential Construction Loan Agreement by the Construction Completion Date September 2, 2006 shall constitute an event of default hereunder, under the Security Instrument and under the Loan Agreement. Provided, however, so long as there exists no other event of default on a one time basis only, Lender in its sole discretion may elect to extend the Construction Completion Date and Rollover Date one or more periods of 30 days each up to a maximum of 120 days to facilitate the completion of construction. In the event Lender makes such election to extend, Borrower shall be required to pay Lender an extension fee equal to the lesser of $500.00 or one quarter of one percent (.25%) of the original principal amount of the Note. Should Lender elect to extend the Construction Completion Date and Rollover Date, Borrower may pay a fee for interest rate protection commensurate with the time of extension granted prior to the expiration of the original Construction Completion Date equal to .50% of the original loan amount for the first 30 days of extension and .125% of the original loan amount for each 30 day period (as applicable) thereafter, up to a maximum of 120 days. Borrower's election to pay for extended rate protection must be exercised prior to the original Construction Completion Date, but no earlier than 45 days prior thereto. If Borrower elects not to pay for such rate protection the rate at which interest will accrue on the Note subsequent to the new Rollover Date shall be equal to the greater of the Face Rate or the rate established by Bank of America, N.A. as its 60 day rate offered fifteen (15) calendar days prior to the new Construction Completion Date, for mortgage loans with terms comparable to those contained in the Note taking any and all previously paid fees and/or discount points into account. Any change in the interest rate or other Note terms shall be evidenced by written modification agreement executed by Borrower and Lender, and such agreement (if applicable for the subject loan type) shall also reflect all terms relating to future interest rate changes.

Any amount of principal not advanced prior to the Rollover Date (whether extended or not) may, in the sole discretion of Lender, be funded into escrow with the closing title company on such Rollover Date, and advances may be made out of such escrow after the Rollover Date in accordance with terms approved by Lender. Alternatively, any funds not advanced under the Residential Construction Loan Agreement upon completion of the construction of the Residence prior to the Rollover Date (whether extended or not) may at Lender's option, be credited against the stated principal amount of the Note on such Rollover Date. Any portion of a payment received in excess of interest due during the Construction Loan Phase shall be applied to principal. This may result in a penalty as described in Section B above.

2.   **Early Completion.** In the event the construction of the Residence as described in the Loan Agreement is completed more than thirty-one (31) days prior to the Construction Completion Date, upon Borrower's fifteen (15) days prior written request, Lender may, in its sole discretion, permit an earlier rollover of the loan from Construction Loan Phase to Permanent Loan Phase.

If Lender so consents Lender shall designate the new Rollover Date and beginning date for permanent monthly payments of principal and interest. The interest rate shall not change unless Section E.1. is designated, in which event the interest rate will be the lesser of (i) the prevailing Market Rate offered by Lender 15 days prior to the early Construction Completion Date, taking any and all previously paid fees and/or discount points paid into account or (ii) the Face Rate. Borrower shall be required to execute a modification agreement evidencing all required changes to the Note, including but not limited to changes in interest rate, first payment due date and amount of monthly principal and interest payment, as applicable.

H.   **MODIFICATION DOCUMENTS.** Should the occurrence of any matters or contingencies addressed herein cause any terms of the Note to change, or necessitate the submission of new disclosures by Lender to Borrower, Borrower agrees to execute all documents Lender deems necessary and appropriate to properly evidence such changes and to confirm receipt of additional disclosures. Borrower's failure to execute such documents reflecting any such changes within the time frame specified by Lender shall constitute an event of default under the Note and Security Instrument.

I.   **NOTICE.** Except as may be required by applicable law, Lender will not provide Borrower notice of interest rate changes during the Construction Loan Phase.

J.   **TRANSFER OF PROPERTY.** Any provision in the Note permitting the Borrower to transfer property that is security for the Note shall not be effective during the Construction Loan Phase. Unless prohibited by applicable law, any transfer of the property securing the Note during the Construction Loan Phase shall constitute a default.

(R&A) 0302477 - eastlord.bax – Rev. 07/27/2004

Loan No.: █████

**K.**   **LATE CHARGE INAPPLICABLE.**   The Late Charge for Overdue Payments provision in the Note shall not be applicable during the Construction Loan Phase.

**L.**   **CONFLICTS.**   If any term or provision of this Addendum shall be in conflict with any term or provision of the Note, the term or provision of this Addendum shall control.

**M.**   **TERMS.**   Except as amended or supplemented hereby, the terms and provisions of the Note shall remain unchanged and in full force and effect.

Except as to the interest rate provisions set forth in sections E., F., G., and H., as applicable, of this Addendum, and so long as no event of default exists hereunder or under any instrument further evidencing or securing this Note, after the advance of all funds as necessary to complete the construction of the Residence as described in the Residential Construction Loan Agreement or the Rollover Date, whichever is later, this Addendum will be null and void and no longer in effect.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Construction Loan Addendum to Note.

_Anthony Pagliaro_ ___ 3/11/06 /Date
Anthony Pagliaro                     Date

_Susan Pagliaro_ ___ 3/11/06 /Date
Susan Pagliaro                     Date

_____ Date          _____ Date

RECORDING REQUESTED BY:
BAC Home Loans Servicing, LP
Attn Home Retention Division: CA6-919-01-43
400 Countrywide Way
Simi Valley, CA 93065

Loan #: ██████████

----------------------------------FOR INTERNAL USE ONLY----------------------------------

# LOAN MODIFICATION AGREEMENT
## (Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 17th day of February 2010, between ANTHONY PAGLIARO, SUSAN PAGLIARO and BAC Home Loans Servicing, LP (Lender), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the Security Instrument), dated the 2nd day of March 2006 and in the amount of $229,498.00 and (2) the Note bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as in the 'Property', located at 102 LANDS END CT, HAMPSTEAD, NC 28443.

| |
|---|
| SAME AS IN SAID SECURITY INSTRUMENT |

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1 As of the 1st day of April 2010, the amount payable under the Note or Security Instrument (the "Unpaid Principal Balance") is U.S. $240,527.42 consisting of the amount(s) loaned to the Borrower by the Lender which may include, are not limited to, any past due principal payments, interest , fees and/or costs capitalized to date.

2 The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender.  Interest will be charged on the Unpaid Principal Balance at the yearly rate of 4.875% from the 1st day of March 2010.  The Borrower promises to make monthly payments of principal and interest of U.S. $1,139.97 beginning on the 1st day of April 2010,  and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on the 1st day of March 2050 (the "Maturity Date"), the Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

3 The Borrower will make such payments at 400 Countrywide Way, Simi Valley, CA or at such other place as the Lender may require.

4 Nothing in this agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.  Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all terms and provisions thereof, as amended by this Agreement.

5 In consideration of this Modification, Borrower agrees that if any document related to the Security Instrument, Note and/or Modification is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, Borrower(s) will comply with Lender's request to execute, acknowledge, initial and deliver to Lender any documentation Lender deems necessary. If the original promissory note is replaced the Lender hereby indemnifies the Borrower(s) against any loss associated with a demand on the original note. All documents Lender requests of Borrower(s) shall be referred to as Documents. Borrower agrees to deliver the Documents within ten (10) days after receipt by Borrower(s) of a written request for such replacement.

As evidenced by their signatures below, the Borrower and the Lender agree to the foregoing

_Anthony J Pagliaro_ (signature)
ANTHONY PAGLIARO

_Susan Pagliaro_ (signature)
SUSAN PAGLIARO

03/01/10
Dated

3/01/10
Dated

STATE OF _North Carolina_
COUNTY OF _New Hanover_
On _March 1, 2010_    Before _Lisa Cayton_
Notary Public, personally appeared _Anthony J Pagliaro_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures (s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Lisa Cayton_ (signature)
Signature

| |
|---|
| **LISA CAYTON** |
| Notary Public |
| Brunswick County, NC |
| My Commission Expires Mar. 16, 2014 |

BAC Home Loans Servicing, LP

By: _____

STATE OF _North Carolina_

COUNTY OF _New Hanover_

On _March 1, 2010_    Before _Lisa Cayton_

Notary Public, personally appeared _Susan Pagliaro_

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures (s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature

```
LISA CAYTON
Notary Public
Brunswick County, NC
My Commission Expires Mar. 16, 2014
```

**Bank of America**

February 17, 2010

SUSAN PAGLIARO
ANTHONY PAGLIARO
102 Lands End Ct
Hampstead        NC  28443 - 3669

RE: BA2 Loan# ▮▮▮▮▮▮▮
Property Address:    102 LANDS END CT
                     HAMPSTEAD, NC 28443

Dear ANTHONY PAGLIARO & SUSAN PAGLIARO:

We are pleased to advise you that your loan modification has been approved.  In order for
the modification to be valid, the enclosed documents need to be signed, notarized, and
returned with the requested certified funds.

The following amounts will be added to your current principal balance, resulting in a
modified principal balance of $240,527.42 prior to your first payment date.  The amount
added to your loan is:

| | |
|---|---|
| Interest: | $10,853.36 |
| Fees: | $0.00 |
| Escrow: | $7,988.40 |
| Total: | $18,841.76 |

Your new modified monthly payment will be $1,657.75, effective with your April 1, 2010
payment.  This payment is subject to change if your escrow account is reanalyzed or if you
have a step rate or adjustable rate loan type.  A breakdown of your payment is as follows:

| | |
|---|---|
| Principal and Interest | $1,139.97 |
| Escrow Items: | $517.78 |
| Optional Insurance: | $0.00 |
| Total Payment: | $1,657.75 |

The following amounts <u>must</u> be paid in CERTIFIED FUNDS in order for the modification to
become effective:

| | |
|---|---|
| Modification Fee: | $75.00 |
| Title and Recording Fees: | $0.00 |
| Delinquent Escrow: | $0.00 |
| Foreclosure Fees: | $0.00 |
| Bankruptcy Fees: | $0.00 |
| Field Inspection Fees: | $0.00 |
| Outstanding Late Charges: | $0.00 |
| NSF/Misc. Fees: | $16.00 |
| Delinquent Mortgage Payment(s): | $0.00 |
| Modified Mortgage Payment(s): | $1,657.75 |
| Partial Payment: | $0.00 |
| Total Amount Due: | $1,748.75 |

This offer is contingent on the following:

We are able to obtain a lender's title insurance policy or endorsement, which insures the
Modified Mortgage as a lien in accordance with our requirements.  If you have any other
encumbrances on the property, then you may be required to obtain agreements by which
other secured creditors subordinate their interests to the Modified Mortgage.

BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.        BA2 Loan#         Page 1 of 2

**Bank of America**

This offer is contingent upon BAC Home Loans Servicing, LP receiving relief from the Automatic Stay for any bankruptcy in which the property referred to in the Loan Modification Agreement is included at the time of the modification.

If any issues arise between the date of this commitment and the date on which all of the terms and conditions of this letter are finalized, including, but not limited to, deterioration in the condition of the property, lawsuits, liens, additional expenses and defaulted amount, then we may terminate this offer and pursue all collection action, including foreclosure.

This letter does not stop, waive or postpone the collection actions, or credit reporting actions we have taken or contemplate taking against you and the property. In the event that you do not or cannot fulfill ALL of the terms and conditions of this letter no later than February 27, 2010, we will continue our collections actions without giving you additional notices or response periods.

The following documents have been enclosed:

☐ **Modification Agreement - must be signed in the presence of a notary. The notary acknowledgement must be in recordable form.** All parties who own an interest in the property must sign the modification agreement, whether or not they are the "borrower".

☐ **Step Rate Modification Addendum** - All parties who own an interest in the property must sign an addendum, whether or not they are a "borrower".

☐ **Automatic Payment Application** - must be completed and signed by all the borrowers as this gives Bank of America authorization to automatically withdraw your monthly mortgage payment from your checking account each month. Please be sure to specify the date you would prefer the payment withdrawn.

**Please return all of the enclosed documents to us in the enclosed pre-paid FED EX envelope no later than February 27, 2010 together with a certified check or money order (with loan number on the check) in the amount of $1,748.75 to the following address:**

**BAC Home Loans Servicing, LP**
**Attn Home Retention Division: CA6-919-01-43**
**400 Countrywide Way**
**Simi Valley, CA 93065**

We look forward to receiving all of the required documents and funds before the deadline and to restoring your account to a current status. If you have any questions about this letter or the enclosed documents, please call (800) 669-0102.

Home Retention Department

---

BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.          BA2  Loan#             Page 2 of 2

Exhibit B

FILED

BK 2 9 1 1 PG 1 6 8

06 MAR 17 AM 9: 29

JOYCE M. SWICEGOOD
REGISTER OF DEEDS
PENDER COUNTY, NC

Recorded and Verified
Joyce M. Swicegood
Register of Deeds
Pender County, NC

## DEED OF TRUST

After Recording Return To:
**Bank of America, N.A.**
**9000 Southside Blvd, Bldg 700 [CONSTRUCTION]**
**Jacksonville, FL  32256-0000**

Return to
Mary C. Fairley, P.C.
P O Box 2550
Surf City, NC  28445
06-0023

Prepared By:
**Bank of America, N.A.**
**P.O. Box 9000**
**Getzville, NY  14068-9000**

Loan No ████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    **"Security Instrument"** means this document, which is dated **March 2, 2006**, together with all Riders to this document.
(B)    **"Borrower"** is **Anthony Pagliaro and wife, Susan Pagliaro**. Borrower is the trustor under this Security Instrument.
(C)    **"Lender"** is **Bank of America, N.A.**. Lender is a **national association** organized and existing under the laws of **the United States of America**. Lender's address is **P.O. Box 9000, Getzville, NY 14068-9000**. Lender is the beneficiary under this Security Instrument.
(D)    **"Trustee"** is **PRLAP, Inc.**.
(E)    **"Note"** means the promissory note signed by Borrower and dated **March 2, 2006**. The Note states that Borrower owes Lender **Two Hundred Twenty Nine Thousand Five Hundred and no/100** Dollars (U.S. **$229,500.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 1, 2036**.
(F)    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G)    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H)    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[ ] Adjustable Rate Rider       [ ] Condominium Rider                [ ] Second Home Rider
[ ] Balloon Rider               [ ] Planned Unit Development Rider   [ ] Biweekly Payment Rider
[ ] Rate Improvement Rider      [ ] Addendum to ARM Rider            [X] Construction Loan Rider
[ ] 1-4 Family Rider            [ ] Revocable Trust Rider            [ ] Subordinate Lien Rider
[ ]

(I)    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**NORTH CAROLINA**--Single Family--**Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT          **Form 3034  1/01** (Page 1 of 11 Pages)
(R&A)  6302477 - si3034.nc - Rev. 10/20/2004



BK 2 9 1 1 PG 1 6 9

(K)      **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)      **"Escrow Items"** means those items that are described in Section 3.

(M)      **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)      **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)      **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)      **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)      **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the **County** of **Pender:**

SEE EXHIBIT 'A' LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES

which currently has the address of **102 Lands End Court, Hampstead, NC 28443** ("Property Address"):

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property".

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

        Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or

BK 2911 PG170

EXHIBIT "A"

Being all of Lot 148, Section 4 of Cross Creek Subdivision as the same is shown on a map thereof recorded in Map Book 38 at Page 17 of the Pender County Registry, reference to which is hereby made for a more particular description

(R&A)  6302477.m&b

partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 then Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**NORTH CAROLINA**--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**        **Form 3034 1/01** (Page 3 of 11 Pages)
(R&A)  6302477 - si3034.nc - Rev. 10/20/2004

BK 2 9 1 1 PG 1 7 2

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public

NORTH CAROLINA--Single Family--~~Fannie Mae/Freddie Mac~~ UNIFORM INSTRUMENT                    Form 3034 1/01 (Page 4 of 11 Pages)
(R&A) 6302477 - si3034.nc - Rev. 10/20/2004

BK 2911 PG 173

adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3034 1/01 (Page 5 of 11 Pages)
(R&A) 6302477 - si3034.nc - Rev. 10/20/2004

BK 2 9 I I PG I 7 4

required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, if permitted under Applicable Law, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the

BK 2 9 1 1 PG 1 75

partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                           Form 3034 1/01 (Page 7 of 11 Pages)
(R&A) 6302477 - si3034.nc - Rev. 10/20/2004

be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3034 1/01 (Page 8 of 11 Pages)
(R&A) 6302477 - si3034.nc - Rev. 10/20/2004

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of _____5%_____ of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3034  1/01  (Page 9 of 11 Pages)
(R&A)  6302477 - si3034.nc - Rev. 10/20/2004

BK 2 9 1 1 PG 1 78

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorney's Fees.** Attorneys' fees must be reasonable.

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)       _____(Seal)
Anthony Pagliaro                -Borrower       Susan Pagliaro                -Borrower

_____(Seal)       _____(Seal)
                                -Borrower                                       -Borrower

**NORTH CAROLINA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3034  1/01  (Page 10 of 11 Pages)
(R&A)  6302477 - si3034.nc - Rev. 10/20/2004

BK 2911 PG 179

STATE OF NORTH CAROLINA, _____ County ss:

    I, _William Williams_ _____, a Notary Public of the County of ___KEnT_____,
State of North Carolina, do hereby certify that **Anthony Pagliaro and wife, Susan Pagliaro** personally appeared before me this
day and acknowledged the due execution of the foregoing instrument.
    Witness my hand and official seal this 14th day of ___MArch____, 2006

    My Commission expires:

              William Williams
          Notary Public ID # 51719
       My Commission Expires: 6/25/2007

                                               Notary Public

STATE OF NORTH CAROLINA _____ County ss:

    The foregoing certificate of _____, a Notary Public of the County of _____
_____, State of _____, is certified to be correct.
    This instrument and this certificate are duly registered at the date and time and in the Book and Page shown on the
first page hereof.

                                        Register of Deeds for Pender County.

                                    By_____
                                               Deputy/Assistant-Register   of Deeds

**NORTH CAROLINA**--Single  Family--~~Fannie Mae~~/Freddie Mac **UNIFORM  INSTRUMENT**       Form 3034  1/01  (Page 11 of 11 Pages)
(R&A)  6302477 - sl3034.nc - Rev. 10/20/2004

BK 2 9 I I PG I 8 0

Loan No.: ▮▮▮▮▮▮▮

## CONSTRUCTION LOAN RIDER TO SECURITY INSTRUMENT

THIS CONSTRUCTION LOAN RIDER TO SECURITY INSTRUMENT is made this **second** day of **March, 2006**, and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to **Bank of America, N.A.** (the "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at: **102 Lands End Court, Hampstead, NC 28443**.

### ADDITIONAL COVENANTS

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Terms defined in the Note shall have the same meaning in this Security Instrument.

**A.    INCORPORATION OF RESIDENTIAL CONSTRUCTION LOAN AGREEMENT**

Lender and Borrower entered into a Residential Construction Loan Agreement (the "Agreement") of even date herewith. The Agreement is incorporated herein by reference. A default under the terms of the Agreement shall constitute a default under the terms of the Security Instrument.

**B.    CONSTRUCTION MORTGAGE**

The Security Instrument is securing the obligation for the cost of construction of certain improvements on the Property. The Security Instrument is a "Construction Mortgage" under the Uniform Commercial Code as adopted and applied in the state where the Property is situated. It is understood and agreed that funds to be advanced under the Note are to be used in the construction of certain improvements on the Property in accordance with the Agreement.

**C.    FUTURE ADVANCES (N.C.G.S. § 45-68)**

This Security Instrument is given to secure future obligations incurred hereunder. The amount of the present obligations secured is **$0.00** and the maximum principal amount, including present and future obligations, is ___ **$229,500.00** ___ . The period within which future obligations may be incurred is from the date hereof until three years from the date hereof. Said maximum amount may be increased by such additional amounts as may be advanced by Lender pursuant to the Security Instrument and all such additional amounts shall be deemed necessary expenditures for the protection of the security in accordance with and to the extent allowed by applicable law.

**D.    WAIVER OF CERTAIN NOTICES DURING CONSTRUCTION**

Notwithstanding the 30 day written notice and right to cure provisions contained in Section 22 of the Security Instrument, prior to the Rollover Date (or agreed written extension thereof), the Borrower, as well as all sureties, guarantors and endorsers of said Note severally waive all notices, demands, presentments for payment, notices of non-payment, notices of intention to accelerate the maturity, notices of acceleration, notices of dishonor, protest and notice of protest, diligence in collecting or bringing suit as to the Note and as to each, every and all installments thereof and all obligations thereunder and against any party thereto and to the application of any payment on said obligation, or as an offset thereto, and agree to all extensions, renewals, partial payments, substitutions or evidence of indebtedness and the taking, release or substitution

BK 2 9 1 1 PG 1 8 1

Loan No.: ▮▮▮▮▮▮▮

of all or any part of the herein described security or the release of any party liable thereon with or without notice before or after maturity.

**E.**       **SECURITY AGREEMENT**

Without limiting any of the provisions of the Security Instrument, Borrower, as Debtor (and being referred to in this paragraph as "Debtor," whether one or more), expressly GRANTS unto Lender, as Secured Party (and being referred to in this paragraph as "Secured Party," whether one or more), a security interest in the following described property (including both those now and those hereafter existing). The definition of Property is hereby expanded to include:

(1) All fixtures, furnishings, equipment, building material and machinery now or hereafter located in, on, or used or intended to be used in connection with the Property, including without limitation: doors, partitions; window and floor coverings; apparatus, material, or equipment for supplying, holding, or distributing heating, cooling, electricity, gas, water, air, and lighting; security, access control, and fire prevention and extinguishing apparatus, material, or equipment; bathroom and kitchen fixtures; cabinetry; and landscaping. (2) All proceeds or sums payable in lieu of or as compensation for the loss of or damage to the Property and the Fixtures and Personal Property, and all rights in and to all present and future fire and hazard insurance policies. (3) All proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking, in whole or in part, of the Property, or for conveyance in lieu thereof.

**F.**       **DEFAULT**

Covenants contained in Section Nos. 18, 19, and 22 of the Security Instrument are hereby suspended during the continuance of this Rider only, and the following substituted in lieu thereof:

In the event any of the following events or conditions occur or exist, each such event or condition shall be a default hereunder entitling Lender to declare the entire indebtedness hereby secured immediately due and payable:

(1)       Any lien, inferior or superior to the lien of this Security Instrument, is created, permitted or filed against the Property, or any portion thereof, without Lender's prior written consent, except current ad valorem taxes which are not then due and payable.

(2)       The sale, assignment or other transfer, voluntarily or involuntarily, of all or a part of Borrower's ownership interest in the Property, or any portion thereof, directly or indirectly, is made without Lender's prior written consent.

(3)       Borrower fails to comply with the terms and conditions of the Note, the Security Instrument or the Loan Agreement.

Upon default, Lender, at its option, may require immediate payment in full of all sums secured by the Security Instrument without demand and may invoke the power of sale and any other remedies permitted by applicable law. However, this option to require immediate payment in full shall not be exercised if such exercise is prohibited by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in the Security Instrument including, but not limited to, reasonable attorney's fees and costs of title evidence.

(R&A)Rev 01/01 6302477                              Page 2 of 3                              ncclrsl.bax

BK 2 9 1 1 PG 1 8 2

Loan No.: ████████

Upon the termination of the provisions of this Rider as set forth below, Covenants contained in Section Nos. 18, 19, and 22 of the Security Instrument shall be reinstated so that they shall then be in full force and effect.

### G.   TERMINATION OF CONSTRUCTION LOAN RIDER

So long as Borrower is not in default under the terms of the Note, the Agreement, or the Security Instrument, and so long as Borrower has completed the improvements described in the Agreement, this Rider shall terminate on the Rollover Date as defined in the Construction Loan Rider to Note, and shall thereafter no longer be in effect.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Construction Loan Rider to Security Instrument and Security Agreement.

_Anthony Pagliaro_  3/11/06
Anthony Pagliaro                          Date

_Susan Pagliaro_  3-11-06
Susan Pagliaro                              Date

_____                    _____
Date                                        Date

Debtor's Mailing Address:
103 Brightside Avenue
Warwick, RI 02889

(R&A)Rev 01/01 6302477                Page 3 of 3                ncclrsl.bax

Exhibit C

## RECORDING DOCUMENT COVER PAGE

'Return to:
Brock & Scott, PLLC
5431 Oleander Drive
Wilmington, NC 28403

Type of Document:             Assignment of Deed of Trust

Deed of Trust Grantor(s): Anthony Pagliaro and Susan Pagliaro

Reference Book:  2911

Reference Page:  168

State of North Carolina, County of Pender

File Number: ████

## ASSIGNMENT OF DEED OF TRUST AND NOTE

For Value Received, the undersigned beneficiary of a Deed of Trust (herein ⌐Assignor⌐) does hereby grant, sell, assign, transfer and convey, unto BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP (herein ⌐Assignee⌐), all beneficial interest under a certain Deed of Trust, dated March 2, 2006 and made and executed by Anthony Pagliaro and Susan Pagliaro grantor(s), To PRLAP, Inc., Trustee, and given to secure payment of Two Hundred Twenty-Nine Thousand Four Hundred Ninety-Eight and 0/100 dollars ($229,498.00) in favor of Bank of America, N.A. which Deed of Trust is of record in Book 2911 at Page 168, in Pender County, State of North Carolina, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust. Said transfer of this Deed of Trust was effective prior to the 18th day of April, 2011.

WHEREAS, the undersigned Assignor has executed this Assignment of Deed of Trust on the _9th_ day of ___June___, 2011.

Bank of America, N.A. (Assignor) *By its Attorney-in-fact CADE), BAC Home Loans Servicing LPC BAC)*

Signature: _Thomas E. Pecosh_

By: _Thomas E. Pecosh_.

Position _Assistant Vice President (AVP)_

_Pennsylvania_ State

_Allegheny_ County

I, _Kenneth J Kearney_, a Notary Public for _Allegheny_ County and above mentioned State, do hereby certify that _Thomas E. Pecosh_ personally appeared before me this day and acknowledged that he (or she) is _AVP_ (Title) of _BAC_, a corporation, and that he/she, as _AVP of BAC, AIF_ (Title), being authorized to do so, executed the foregoing on behalf of the corporation.

Witness my hand and official seal, this the _9_ day of _June_, 20 _11_.

(Official Seal)

_Kenneth J Kearney_, Notary Public

My commission expires _June 16_, 20 _11_.

```
NOTARIAL SEAL
KENNETH J KEARNEY
Notary Public
PENN HILLS TWP, ALLEGHENY COUNTY
My Commission Expires Jun 16, 2011
```

File Number: ▇▇▇